FILED

1  CUNEO GILBERT & LADUCA, LLP
   JON TOSTRUD (State Bar No. 199502)
2  1801 Century Park East, Suite 2400
   Los Angeles, CA 90067
3  Telephone: (310) 418-8262
   Facsimile: (310) 556-9622
4  E-mail: tostrud@yahoo.com

2008 SEP 15  PM 2: 17

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

5  CUNEO GILBERT & LADUCA LLP
   JONATHAN W. CUNEO
6  ROBERT J. CYNKAR
   MATTHEW MILLER
7  507 C Street, NE
   Washington, DC 20002
8

9  Attorneys for Plaintiffs

10              UNITED STATES DISTRICT COURT

11        FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13  _____

| | |
|---|---|
| 14  P.E. LUCAS, | ) |
| 15  Derivatively on Behalf of Bank of America | ) |
| 16  Corporation, and its shareholders, | ) |
| 17 | ) |
| 18              Plaintiff, | ) |
| 19 | ) |
| 20 | )   Case No. |
| 21              v. | )   CV08-06029 |
| 22 | ) |
| 23  KENNETH D. LEWIS, GENE TAYLOR, | ) |
| 24  JOE L. PRICE, AMY WOODS | ) |
| 25  BRINKLEY, WILLIAM BARNET, III, | ) |
| 26  FRANK P. BRAMBLE SR., JOHN T. | ) |
| 27  COLLINS, GARY L. COUNTRYMAN, | ) |
| 28  TOMMY R. FRANKS, CHARLES K. | ) |

CAF
FMOX

GIFFORD, MONICA C. LOZANO,                )

WALTER E. MASSEY, THOMAS J. MAY,          )

PATRICIA E. MITCHELL, THOMAS M.           )

RYAN, O. TEMPLE SLOAN, JR.,               )

MEREDITH R. SPANGLER, ROBERT L.           )

TILLMAN, and JACKIE M. WARD,              )

                                          )

                                          )

Defendants,                               )

                                          )

and                                       )

                                          )

BANK OF AMERICA CORPORATION,              )

                                          )

Nominal Defendant.                        )

_____   )

## COMPLAINT

### NATURE OF THE CASE

1.    Plaintiff P.E. Lucas, a shareholder of Bank of America Corporation, ("BOAC" or "the Company"), brings this derivative action on behalf of the Company and its shareholders against certain current and former officers and directors of BOAC to remedy, *inter alia*, the massive mismanagement of the Company, breaches of fiduciary duty, waste of the Company's assets, and the dissemination of false and misleading information regarding the Company's true financial and operating condition.

2.    Since approximately 2005, senior management, led by Defendant Kenneth D. Lewis, operating under the purported oversight of the Company's

1   Board of Directors (the "Board"), has conducted a reckless drive to expand the
2   Company far past its capacity to manage the risks of the unfamiliar financial
3   products on which this expansion was built. This growth-at-any-cost policy took
4   the Company far into subprime financing and related risky ventures, culminating in
5   BOAC's July 1, 2008, acquisition of Countrywide Financial Corporation
6   ("Countrywide"), one of the nation's largest originators of subprime mortgages and
7   a target of numerous governmental investigations and private litigation. Most
8   recently, on September 14, 2008, BOAC announced a transaction to acquire
9   Merrill Lynch & Co., Inc.  ("Merrill") for approximately $44-50 billion in the
10  Company's common stock, almost double the market price of Merrill shares on the
11  previous trading day. While senior management and members of the Board have
12  profited from this expansion, for the Company, it has led to billions of dollars of
13  losses, additional provision for massive future losses, and the deterioration of
14  BOAC's stockholders equity by billions of dollars. In the process, BOAC has been
15  turned into a "house of cards."

16      3.    No end is in sight to the devastating impact of this reckless
17  mismanagement on the Company. BOAC's profits fell in 2007 by approximately
18  30 percent (and that after reporting a profitable first two quarters for the year). In
19  the quarter just ended, BOAC's reported net income fell to $3.41 billion, or 72
20  cents per share, from $5.76 billion, or $1.28 per share, a year earlier. This result,
21  which appears to be materially overstated, does not include the $2.33 billion loss at
22  Countrywide for that quarter, which was acquired by BOAC the day after the
23  quarter closed.

### REQUIRED DEMAND PURSUANT TO RULE 23.1

24

25      4.    By letter dated May 23, 2008, in compliance with Rule 23.1 of the
26  Federal Rules of Civil Procedure, Plaintiff, through counsel, made demands on
27  BOAC's Board to, *inter alia*, pursue through litigation, the claims alleged in this
28  action and name as Defendants those identified above, among others responsible

1   for the wrongdoing as alleged herein (the "Demand Letter").   A copy of the
2   Demand Letter is attached as Exhibit "A."   The Board apparently treated the
3   Demand Letter as if it had no material significance since, as of the date of this
4   Complaint, four months after it was sent, the Board has neither responded to the
5   Demand Letter nor taken the actions demanded therein.[1]   Accordingly, Plaintiff's
6   demands have been effectively rejected by the Board.

7                          <u>**JURISDICTION AND VENUE**</u>

8        5.      This Court has jurisdiction over all claims asserted herein under 28
9   U.S.C. §1332, as complete diversity exists between plaintiff and each of the
10  Defendants and the amount in controversy exceeds the jurisdictional minimum of
11  this Court.

12       6.      This action was not brought collusively to confer jurisdiction on a
13  court of the United States that would not otherwise have jurisdiction.

14       7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because,
15  among other things, many of the acts alleged and complained of herein occurred in
16  this District.

17       8.      Plaintiff brings this action derivatively on behalf of nominal
18  Defendant BOAC and its shareholders.  No claims for damages are asserted against
19  BOAC.  Plaintiff will adequately and fairly represent the interests of BOAC and its
20  shareholders in enforcing and prosecuting their rights.

21
22
23
24
25
26
27
28

---

[1] On June 16, 2008, three weeks after Plaintiff's Demand Letter was sent, rather than hearing from a representative of or counsel for BOAC's Board of Directors, an in-house lawyer, Alice A. Herald, wrote to Plaintiff's counsel that the Demand Letter would be "considered by the **Bank of America** Board of Directors at the Board's next regularly scheduled meeting." [emphasis added] In the three months since, Plaintiff's counsel has heard nothing further from Ms. Herald or anyone else affiliated with BOAC with respect to the Demand Letter.

## THE PARTIES

### A. PLAINTIFFS

9.   Plaintiff P.E. Lucas is a citizen of Florida who, through a revocable trust, owns and has owned common stock of BOAC at all relevant times.

### B. NOMINAL DEFENDANT

10.   Nominal Defendant BOAC, a Delaware corporation, is a banking and financial services holding company that operates throughout the United States and in more than 30 countries.  It provides a diverse range of banking and nonbanking financial services and products domestically and internationally.   In the United States, it operates more than 6,100 banking centers.   It is headquartered in Charlotte, North Carolina. Its principal subsidiary is Bank of America, N.A. ("the Bank).

### C. INDIVIDUAL DEFENDANTS

11.   Defendant Kenneth D. Lewis is, and at all relevant times was, Chairman of the Board, Chief Executive Officer, and President of BOAC.  Upon information and belief, he is a citizen of North Carolina.

12.   Defendant Gene Taylor was at all relevant times Vice Chairman of BOAC and President of Global Corporate and Investment Banking.  He retired from BOAC on December 31, 2007.  Upon information and belief, he is a citizen of North Carolina.

13.   Defendant Joe L. Price is, and at all relevant times was, Chief Financial Officer of BOAC.  Upon information and belief, he is a citizen of North Carolina.

14.   Defendant Amy Woods Brinkley is, and at all relevant times was, Chief Risk Officer of BOAC (now called Global Risk Executive).  Upon information and belief, she is a citizen of North Carolina.

15.   Defendant William Barnet, III, has been a member of BOAC's Board of Directors since 2004.   Upon information and belief, he is a citizen of South Carolina.

5

1    16.   Defendant Frank P. Bramble, Sr., has been a member of BOAC's Board
2  of Directors since 2006.  Upon information and belief, he is a citizen of Delaware.

3    17.   Defendant John T. Collins has been a member of BOAC's Board of
4  Directors  since  2004.    Upon  information  and  belief,  he  is  a  citizen  of
5  Massachusetts.

6    18.   Defendant Gary L. Countryman has been a member of BOAC's Board
7  of Directors  since  2004.    Upon  information  and  belief,  he  is  a  citizen  of
8  Massachusetts.

9    19.   Defendant Tommy R. Franks has been a member of BOAC's Board of
10  Directors since 2006.  Upon information and belief, he is a citizen of Oklahoma.

11    20.   Defendant Charles K. Gifford has been a member of BOAC's Board of
12  Directors  since  2004.    Upon  information  and  belief,  he  is  a  citizen  of  North
13  Carolina.

14    21.   Defendant Monica C. Lozano has been a member of BOAC's Board of
15  Directors since 2006.  Upon information and belief, she is a citizen of California.

16    22.   Defendant Walter E. Massey has been a member of BOAC's Board of
17  Directors since 1998.  Upon information and belief, he is a citizen of Georgia.

18    23.   Defendant Thomas J. May has been a member of BOAC's Board of
19  Directors  since  2004.    Upon  information  and  belief,  he  is  a  citizen  of
20  Massachusetts.

21    24.   Defendant Patricia E. Mitchell has been a member of BOAC's Board of
22  Directors since 2001.  Upon information and belief, she is a citizen of New York.

23    25.   Defendant Thomas M. Ryan has been a member of BOAC's Board of
24  Directors since 2004.  Upon information and belief, he is a citizen of Rhode Island.

25    26.   Defendant O. Temple Sloan, Jr., has been a member of BOAC's Board
26  of Directors since 1996.  Upon information  and  belief,  he  is  a  citizen  of  North
27  Carolina.

28

27.   Defendant Meredith R. Spangler has been a member of BOAC's Board of Directors since 1988.   Upon information and belief, she is a citizen of North Carolina.

28.   Defendant Robert L. Tillman has been a member of BOAC's Board of Directors since 2005.   Upon information and belief, he is a citizen of North Carolina.

29.   Defendant Jackie M. Ward has been a member of BOAC's Board of Directors since 1994.  Upon information and belief, she is a citizen of Georgia.

## GENERAL ALLEGATIONS

### A. EXPANSION OF SUBPRIME INVESTMENTS

30.   "Subprime" mortgage loans refer to loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio, or an extended period for repayment, or describe loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms.   To create liquidity for these subprime mortgages, financial institutions that did not necessarily originate these loans themselves would purchase these mortgages and bundle them to create mortgage-backed securities ("MBSs").   Moving even farther away from the original loans, these MBSs would themselves often be bundled to create collateralized debt obligations ("CDOs"). Bundling loans into salable securities in this way involves significantly more risk and uncertainty than traditional interest rate and credit products.   CDOs hold inventories of asset-backed or income securities at various risk levels. Underwriters then market rights to the income from these various levels in tranches set by debt type and risk levels.  These securities are inherently complex and their values depend on several variables, including market, credit, liquidity, and other market conditions affecting the various constituent securities. The actual values of such pools of MBSs and CDOs are frequently not readily determinable by issuers, sellers or holders of them and are frequently hidden from public view.

7

31.   These securities became increasingly popular in the early 2000's, when low interest rates made regular bond yields less attractive and spurred significant growth in consumer and mortgage borrowing.   Starting in late 2004, senior management of BOAC and the Bank recklessly expanded and transformed the Company's investment division.   The Company undertook an enormous, inadequately considered, and hidden exposure to excessively risky subprime mortgage-backed investments, at the worst-chosen time when market signals warned against such exposure, ultimately causing BOAC billions of dollars in damages.

32.   The overall reckless drive for growth by Defendant Lewis and the rest of BOAC's senior management and Board was intended to greatly expand the Company's investment banking business. In furtherance of such plan, in late 2004, Defendant Lewis, Chief Executive Officer of BOAC since 2001, launched a plan to spend $675 million to hire more traders, salespeople and bankers. In 2005, Defendant Lewis put Defendant Gene Taylor in charge of the newly created investment division and made him Vice Chairman of the Company.

33.   Although Defendant Taylor had long experience in commercial banking and other non-investment operations, he had no experience with investment banking in general, let alone with the new and highly complex financial products, such as those based on subprime mortgages, which now came to the forefront such as MBSs and CDOs.   Indeed, Defendant Lewis's enormous expansion of the Company's investment division pushed it into high-risk mortgage-backed investments, without either Defendant Lewis, BOAC or its Board having the background, experience, or risk management capacities to avoid colossal blunders.

34.   In 2005-2007, senior management rapidly increased the Company's involvement with the underwriting of subprime MBSs.   Since BOAC did not generally originate or service subprime mortgages itself at the time, its investment

1   division would take subprime mortgages originated and serviced by others, and
2   bundle these into MBSs and from these MBSs create CDOs.   BOAC's
3   management would then underwrite the sale of the CDOs.

4       35.   Without the experience or adequate risk management in-house to put a
5   prudent brake on its activities, BOAC's investment division went even further to
6   become involved with a novel investment product, what BUSINESS WEEK called "a
7   particularly aggressive form" of CDO, called "Klio Funding."   Klios were
8   developed by Ralph Cioffi of Bear Stearns, who was subsequently indicted for
9   securities fraud as to CDO investments in June 2008.  As BUSINESS WEEK put it,
10  Klios "became the building blocks of the [mortgage] industry's push to keep
11  growing for longer than it otherwise would have," and so "became a template for
12  subprime disaster."

13      36.  As BUSINESS WEEK explained, Klios "were entities that sold
14  commercial paper and other short-term debt to buy higher yielding, longer-term
15  securities."   These CDOs could obtain short-term loans to buy subprime MBSs
16  because, supposedly, "investors didn't need to worry about the risky assets the
17  Klios owned" since a bank would agree "to refund their initial stake plus interest,
18  through what's known as a 'liquidity put,' if the market soured."   It was this
19  reckless issuing by BOAC of these "liquidity puts" – commitments to buy back
20  investments at a high price were they to fall – that brought BOAC into disaster.
21  "The Klio structure spread rapidly as . . . banks, including Barclay's, Bank of
22  America, and Societe Generale, followed Cioffi's lead."

23      37.  Liquidity puts are a financial maneuver that is particularly toxic to
24  transparent corporate finance and government because they exposed the Bank to a
25  significant liability that is not recorded on the Company's books.  BOAC's liquidity
26  puts allowed any buyer of its CDOs who ran into financing problems to sell them
27  back to BOAC at their original price, even if that price was or is now far more than
28  they are worth.   Those CDOs were moved by the Company's management off

BOAC's balance sheet when they were "sold," but there was no accounting for the fact that BOAC could be required to re-purchase them in the future and the contingent liability of such occurrences. In short, liquidity puts allowed BOAC to sell CDOs without really selling them. Even worse, as the housing market began to decline, it was necessary for BOAC to provide more liquidity puts to get investors to buy CDOs whose value was increasingly in question. Essentially, the Company's management made BOAC a guarantor of these subprime-backed securities, and increasingly did so even as it became apparent that BOAC would have to make good on that guarantee. At all times, the Company's Board, in the exercise of its stewardship of the Company, knew or should have known of the extent of the risks to which management was exposing BOAC.

38.   BOAC's management not only followed Cioffi into this rash multi-billion-dollar line of Klio investment, it stayed with him to the predictable crash-landing end. As the BUSINESS WEEK analysis continues, "Amid the market turmoil earlier this spring [of 2007], Cioffi hoped the Klios would work their magic once again. In April, as losses at the funds [managed by Cioffi] mounted, Cioffi set up another CDO, High Grade Structured Credit CDO 2007-1, which issued short-term paper and offered investors a money-back guarantee from Bank of America. Cioffi had raised nearly $4 billion by late May, making it the biggest CDO of the year..." That is, even after the market crash began, senior management and the Board continued to lead BOAC into record-breaking ventures of the riskiest kind, working closely with Cioffi and others of his ilk.

39.   By late 2007, BOAC was obliged to take enormous writedowns for having worked so closely with the indicted securities defrauder Cioffi. As the BUSINESS WEEK analysis concluded, "After the market turned, it became clear the Cioffi money machine contributed much to the $10-billion plus in writedowns that Citigroup and Bank of America revealed in November."

40.   The Company ultimately disclosed $16 billion in various types of exposure to CDOs, about three-fourths with ties to subprime mortgages.  BOAC had $2.1 billion in liquidity puts at the end of 2006, a figure which rose to $10 billion by the end of September 2007.  Stunningly, senior management plunged BOAC headlong into providing Cioffi-style "liquidity puts" in 2007, a time when the market signals strongly warned that the subprime tide had crested and was falling rapidly. Under such prevailing circumstances, it was extremely reckless for the Company's management to gamble billions of dollars against the market trend by providing such "liquidity puts" for CDOs.   Meanwhile, as its Board knew or should have known, BOAC did not hedge against this extraordinary risk management took on.

41.   By the end of 2007, BOACs exposure to subprime mortgage-related CDOs totaled $12.1 billion.  For the third quarter of 2007, BOAC took an enormous $5.3 billion writedown for these subprime MBS and CDO exposures. Despite that writedown's size, observers warned that BOAC had understated the necessary further writedowns ahead.  In January 2008, CreditSights reported that "after writedowns and insurance, Bank of America recorded approximately $8.2bn of what it deemed subprime CDO net exposure.  We remain concerned that the insurance provided by monolines could become impaired given their credit difficulties, which would push net subprime CDO exposure back in the $12bn range."

42.   From mid to late 2007, as the disastrous consequences of this reckless expansion he had championed could no longer be avoided, Defendant Lewis forced out of the Company the investment managers who had presided over this disaster on his behalf: Mark Werner, CEO of Banc of America Securities; Thomas Berkery, COO for global markets; Thomas Connor, head of global liquid products; and Patric Coleman, head of global markets institutional sales, and then finally Defendant Taylor himself, the Vice Chairman and head of the Company's

11

1   investment division, who "retired" effective December 31, 2007.  These waves of

2   forced departures amounted to trying to lock the barn door after all the horses had

3   foolishly been allowed to escape.  As a consequence of the foregoing reckless

4   conduct, the Company has already lost billions of dollars and faces many more

5   billions of dollars in losses that cannot be determined since appropriate writedowns

6   have yet to be taken and because BOAC cannot fully quantify its exposure to loss

7   as a result of the off-balance sheet liquidity puts it issued.

8                    **B.  THE COUNTRYWIDE ACQUISITION**

9       43.   Long after they knew it was extraordinarily risky to do so, Defendant

10   Lewis and the Company's senior management led BOAC into an initial investment

11   of $2 billion for a 16% stake in Countrywide in August, 2007.  A complete

12   purchase of Countrywide, for $2.5 billion more, was concluded on July 1, 2008,

13   notwithstanding the fact that, by January 2008 Countrywide's stock had

14   plummeted by more than 60% and BOAC's original $2 billion investment had

15   already sustained a $1.3 billion loss and the further investment carried even higher

16   risks than 11 months earlier.  As one analyst commented as to Defendant Lewis

17   and the Board's consummation of the investment in Countrywide, "the initial

18   purchase of 20% was a bad move, and now they are trying to throw more money at

19   it to validate their original buy (this phenomenon is called irrational escalation)."

20       44.   This investment lacked adequate due diligence -- or manifested an

21   irresponsible blindness of BOAC's Board and senior management to the riskiness

22   of Countrywide's mortgage portfolio and its highly material contingent liabilities,

23   particularly massive exposure to litigation and claims by borrowers that their loans

24   should be forgiven due to fraud in the inducement and other improper practices, all

25   of which was known or reasonably knowable by Defendant Lewis and senior

26   management in August 2007 and clearly known by them in July 2008, when the

27   remainder of Countrywide was purchased by the Company.

28

45.   In the mid-2000s, Countrywide was the nation's largest originator of mortgages, and among the principal originators of subprime mortgages, until it belatedly recognized the market signals in 2007 and stopped subprime origination. It also was a principal originator of "Alternative-A" or "Alt-A" mortgages. Alt-A loans are made to borrowers without the record of deficiencies of subprime borrowers, but require fewer, or often no, documentation supporting the borrower's claimed income and other aspects of his supposed credit-worthiness. Because of such lack of supporting documentation, they are frequently referred to as "liar loans." The reasons why such loans have been popular with borrowers is obvious – they can inflate their claimed earnings with near impunity.   So many Alt-A borrowers are now in fact not creditworthy or never were that one industry expert, Mark Adelson, head of structured finances at Nomura Securities International, has observed, "The Alt-A market has absorbed and disguised a portion of the subprime space.   You can debate how to define these loans, but many have ended up being an Alt-A product with subprime deficiencies."

46.   As a result, by August 2007, Countrywide had staggering exposure in subprime and Alt-A mortgages, all readily determinable in a "due diligence" examination of Countrywide's books and records.   Countrywide was servicing 9 million loans for $1.46 trillion.   Its balance sheet had $27 billion of "pay option" ARMs (adjustable rate mortgages), a notorious Alt-A loan type in which borrowers would accumulate substantial unpaid interest until, in the real estate market from 2007 on, they would either require foreclosure or would walk away from the property.   Its $27 billion of financial instruments were believed to be MBSs of a low quality.   Countrywide held $32 billion of second-lien home-equity loans, again highly likely, in the real estate market from 2007 on, to become worth billions of dollars less than they were the amounts at which they were recorded, for with dropping home values, there was increasingly little or no equity beyond the first-lien loans.

1    47.   Even worse for BOAC than the sheer magnitude of Countrywide's pay-
2  option ARMs is what the Court in *In re Countrywide Financial Corp. Derivative*
3  *Litigation*, 2008 WL 2064977, *14 (C.D. Cal. May 14, 2008), called the
4  "exponentially rising negative amortization" on those ARMs, combined with their
5  "yearly doubling and tripling of delinquency rates."   "Negative amortization . . .
6  added to the principal owed on mortgages and thus presented a special risk that a
7  foreclosure sale would not fully cover the mortgage principal amount and would
8  result in a credit loss."  *Id.*, at *14 n. 19.  So serious of a "red flag" were these facts
9  that the *Countrywide* Court relied in part on them to conclude that Credit
10  Committee of Countrywide's Board proceeded with "deliberate recklessness" in
11  failing to reevaluate the adequacy of Countrywide's loan loss reserves, *id.*, at *14,
12  and that the Finance Committee proceeded with "deliberate recklessness" in failing
13  to change Countrywide's investment strategy.  *Id.*, at *15.  Put most simply, that
14  recklessness was manifested by these Board members' ignoring "the fact that
15  originating loans to borrowers who could not pay back their mortgages would
16  ultimately be counterproductive, lucrative as it was in the short term."  *Id.*  It is
17  these loans that are on Countrywide's books due to the judicially determined
18  recklessness of its Board of Directors that BOAC has acquired in a further
19  manifestation of recklessness, particularly in the face of the May 23, 2008 letter
20  written on behalf of the Plaintiff to the Company's Board referred to at ¶4, *supra*.
21    48.   Moreover, prior to the consummation of BOAC's acquisition of it,
22  Countrywide's contingent liabilities in the form of civil and criminal exposure
23  were quite serious, and worsening with each passing month.  It was not only that
24  the quantity of litigation had increased, but the seriousness of the charges had
25  grown.   Upon information and belief, there are presently ongoing criminal and
26  civil investigations of Countrywide being conducted by, *inter alia*, the Federal
27  Bureau of Investigation and the Securities & Exchange Commission.    Such
28  investigations are examining mortgage origination fraud, conflicts of interest, and

1    undisclosed relationships with, *inter alia*, appraisers, as well as the practices used
2    to package mortgage-backed securities for sale to investors. Lawsuits have been
3    filed against Countrywide by the Attorneys General of California, Illinois, and
4    Florida raising claims of deceptive advertising and unfair trade practices.
5    Countrywide has been accused in shareholder litigation of having "misled
6    investors by falsely representing that Countrywide had strict and selective
7    underwriting and loan origination practices, ample liquidity that would not be
8    jeopardized by negative changes in the credit and housing markets, and a
9    conservative approach that set it apart from other mortgage lenders."
10       49.    The serious nature and scope of the Countrywide contingent liabilities
11    now taken over by BOAC were powerfully set out by the *Countrywide* Court,
12    upholding a complaint against Countrywide. Based on extensive statements by
13    Countrywide managers, the record developed in those proceedings shows that,
14    starting in 2002, Countrywide shifted its mortgage origination, securitization, and
15    servicing toward various non-traditional, higher risk loans. These included ARMS
16    with introductory "teaser" loans; interest-only or pay option loans, which might not
17    amortize the loan principal; stated income loans, as to which borrowers often
18    misrepresent their income; and home equity lines of credit. Countrywide
19    exacerbated the risky nature of these loans by offering them to non-creditworthy
20    borrowers. It misled those who purchased its mortgages or MBSs about these
21    risks. These and similar aspects of its operations led to a drastic drop in the value
22    of Countrywide's stock and in its value generally. At any time before it
23    consummated the Countrywide acquisition, based upon the further revelations that
24    became public and materially worsened circumstances, BOAC could have
25    terminated the transaction but did not do so.
26       50.    While Countrywide's increasingly precarious condition, viewed in
27    isolation from BOAC, was unsuitable for an acquisition by any acquirer, BOAC's
28    own materially weakened condition made it particularly inappropriate as an

1   acquirer for a business facing the magnitude and complexity of Countrywide's
2   challenges.   In January 2008, BOAC's mortgage servicing portfolio was $.38
3   trillion, while Countrywide's was $1.48 trillion.   NATIONAL MORTGAGE NEWS
4   reported in January 2008 that "When BOAC finally swallows CFC [Countrywide]
5   it will have a $1.9 trillion servicing portfolio and a market share of 21%, its
6   production market share will be 23%."  In other words, BOAC was compounding
7   its own enormous exposure with Countrywide's even greater exposure to the same
8   risks.  Mortgages, particularly subprime and Alt-A, were moving into a period of
9   very high default rates as housing prices plummeted and the economy worsened,
10  placing enormous challenges on large servicing portfolios such as those of BOAC
11  and Countrywide.   To any rational observer, BOAC is now vulnerable to being
12  swamped by the combined challenge of its own and Countrywide's portfolios.

13      51.   As THE NEW YORK TIMES noted in an article on January 11 following
14  the announcement of BOAC's acquisition of Countrywide, the Company's highly
15  speculative "investment" in it has already damaged BOAC's reputation: "It went
16  looking for a bargain and got burned."  THE WALL STREET JOURNAL that same day
17  put it:  "[The acquisition of Countrywide by BOAC] also would bring some ticking
18  time bombs, whose power to destroy value won't be clear at least until the housing
19  market bottoms out."

20      52.   The Countrywide transaction is all the more perilous for BOAC as a
21  step following the Company's acquisition of LaSalle Bank from a Dutch holding
22  company for about $21 billion in cash.  BOAC's reported capital levels had been
23  materially reduced to about a reported 6.9% and probably less, well below
24  Defendant Lewis' stated target of 8% and barely above the minimum regulatory
25  requirement of 6%.  While BOAC, like other banks and bank holding companies,
26  could attempt to obtain additional capital inflows, these multiple factors reducing
27  its capital levels make it unlikely that even a large capital inflow would suffice to
28  deal with the whole problem.  BOAC's deteriorating capital is sinking to levels

wholly inadequate to conduct operations safely, particularly given its diverse and far-flung operations and its vulnerability to many more billions of dollars of losses. In the wake of attempting to digest the Countrywide acquisition, BOAC entered into a "shotgun" marriage with Merrill, which will further compromise the ability of the Company to recover financially and operationally.

### C. OTHER RECKLESS VENTURES EXPOSING BOAC TO RISKS RELATED TO THE SUBPRIME CRISIS

53. The Company acquired enormous exposure to losses on credit card loans when, at Defendant Lewis' direction and at the height of the market and without sufficient due diligence, it bought MBNA in 2006 for $34.2 billion. At such time, credit card debt at MBNA was growing rapidly, much of it extended to already over-burdened consumers, with questionable prospects for repayment. In early 2008, analysts noted that certain financial institutions with exposure to such credit card debt, particularly BOAC, faced increasingly large risks that correlated with risks that such institutions had already taken on from subprime and Alt-A mortgages and mortgage-based securities. As the unemployment rates rose, the default rates increased both on credit card loans and the riskier mortgages such as subprime and Alt-A. A report by Goldman Sachs anticipated card losses at BOAC rising to 6% or $500 million in incremental losses. The Company sustained substantial and ever-increasing damages arising from its reckless acquisition of MBNA in an amount that cannot presently be determined by Plaintiff.

54. Defendant Lewis, in his quest for short-term earnings growth at the expense of prudent banking practice, led the Bank to acquire enormous exposure to losses on so-called "leveraged loans," loans the Bank made to fund private highly leveraged buy-outs of companies. BOAC made these loans expecting to pass them on, recklessly gambling that the leveraged loan market would not seize up when the subprime MBS market did. Buyers would not take these leveraged loans without a substantial discount, obliging BOAC to writedown the loans' value regardless of whether held or sold. BOAC had, as of early 2008, at least $12

billion of exposure to leveraged loans and additional commitments to finance other highly leveraged transactions. Relatively early, in October 2007, Financial Times reported that "JPMorgan and Bank of America are big lenders to private equity firms and the bulk of their writedowns will come from leveraged loan commitments they had intended to syndicate but on which they would take a loss if they sold them now." BOAC, though, in making the commitments that it did, was relatively new and inexperienced as a leveraged buy-out financier and lacked well-developed risk management, compared to others more capable of assessing the risks inherent in such financing. Moreover, Defendant Lewis and the Bank's senior management had been singularly ill-advised to take on the $12 billion of exposure to leveraged loans, on top of its other correlated exposure.

55. Another reckless escapade into which senior management led BOAC did serious damage to its reputation. BOAC's Boston-based investment unit, Columbia Management, established a giant enhanced money fund called the Columbia Strategic Cash Portfolio. Columbia was by far the biggest of its kind, which offered higher returns than ordinary money market funds by making riskier loan investments while aspiring, like the ordinary ones, to return $1 of principal for each $1 invested. Columbia had $40 billion in assets in November 2007, or one-fifth of the entire $200 billion in such enhanced money funds. In the wake of this high-risk strategy, some of Columbia's investments were devalued materially or frozen, apparently including its investment in high-risk structured investment vehicles ("SIVs"). A run on the fund rapidly reduced its assets to $12 billion, and BOAC closed it with investors losing about half a cent on the dollar, known in the trade as "breaking the buck" because the firm did not return $1 for each $1 invested. BOAC provided about $600 million to prop the fund up. For such a money fund to "break the buck," while obliging BOAC to provide the necessary capital to mitigate its losses, strikingly illustrated to the market that the Company has contingent liabilities far beyond those stated on its balance sheet, and was a

1  dramatic blow to market confidence in BOAC.  This is but one example among
2  many of how BOAC's packaging and sale of CDOs and SIVs have exposed the
3  Company to massive liabilities from purchasers of such "products," none of which
4  liabilities are reflected in its financial statements.

5      56.  Other risks to which the Company has been subjected recklessly by
6  senior management and the Board are concealed in off-the-books entities, known
7  as "Variable Interest Entities" ("VIEs"), which were created by the Bank for a
8  variety of reasons.  For the Bank, VIEs allowed it to have holdings that are
9  technically off the balance sheet and yet controlled by the Bank in practice.  With
10 such a device, the Bank has increased its borrowing and risky lending without
11 appearing to create liabilities that could dilute its required capital as recorded on its
12 balance sheet.  BOAC has disclosed $13.6 billion in VIE exposure, a recklessly
13 high level, through February 2008. Its true exposure to loss from such reckless off-
14 balance sheet legerdemain remains unknown to the public.

15     57.  Other banks with VIEs have had to take large writedowns, as the value
16 of the CDOs and SIVs held in their VIEs fell.  They recognized that, as a practical
17 matter, though VIEs might nominally be distinct from the bank, they had to
18 support their VIEs to protect their own reputation in the market.  There is no
19 reason to believe that the Bank's VIEs are not subject to the same serious risks --
20 and losses -- inflicted on other banks by their VIEs.  The refusal of senior
21 management to furnish more information about the Bank's VIEs strongly suggests
22 that management is well aware of the risks and potential liabilities of its VIEs and
23 are seeking to limit public disclosure of them.  The problems of other banks with
24 their VIEs also strongly suggests that the Bank's risks with its VIEs are directly
25 correlated with risks from its subprime mortgage investments and BOAC's
26 acquisition of Countrywide and its planned acquisition of Merrill which will
27 further compound the Company's risk of collapse.
28

## D. MISREPRESENTATION OF BOAC'S FINANCIAL CONDITION

58. The Defendants breached their duties of loyalty, candor and good faith by directly or indirectly causing BOAC, *inter alia*, to materially misrepresent its financial results, condition and prospects, and to conceal the likely economic and other negative consequences of the Defendants' transformation of the Company from its longstanding posture as a conservative bank holding company, taking a prudent, long-term   view of its investments, to an institution in which the immediate, short-term lucrative deal based on novel and untested financial products governed business strategy.

59. Aiming for short-term profits was clearly in the self-interest of senior management, whose compensation was increased by such performance.   Such artificially generated profits, with their immediate positive impact on BOAC's stock price, were also in the interest of the Board, whose compensation includes restricted stock awards, currently in the amount of $160,000 annually.   While benefiting the Defendants, they knew or should have known that such "high-flying" high-risk maneuvers as described herein were not and are not in the best interests of the long-term financial stability and profitability of BOAC with which they had been entrusted.

60. Senior management and the Board failed to inform BOAC's shareholders and the investing public generally of the known risks of underwriting CDOs comprised of subprime assets, of acquiring Countrywide so encumbered with subprime assets itself, and of the other related reckless ventures into which they led the Company.   They failed to inform BOAC's shareholders and the investing public of the extraordinary losses that would befall the Company and its investors as a result of these actions, all of which was known or should have been known by each of the Defendants.   When the real estate market did begin to deteriorate, as they knew was occurring, senior management and the Board failed to disclose the extent of the Company's exposure to losses, to set aside adequate

20

1   reserves, to appropriately writedown the values of assets on the Company's
2   balance sheet (including real estate owned and loans receivable) or to otherwise
3   vigorously mitigate the problem for fear of cutting BOAC's reported short-term
4   profits and alerting the market and BOAC's investors to the Company's true
5   financial and operating condition.

6       61.   In connection with the foregoing conduct by the Company's senior
7   management and its Board, its publicly disseminated financial statements were
8   false and misleading and intentionally not prepared in accordance with generally
9   accepted accounting principles ("GAAP"), nor audited by PricewaterhouseCoopers,
10  LLP ("PWC"), the Company's purportedly independent auditor, in accordance
11  with generally accepted auditing standards ("GAAS"), which auditing services it
12  contacted with BOAC and its Audit Committee to provide. At all relevant times,
13  particularly by the time of the release of the Company's "audited" results for 2007,
14  the Company's Board and its Audit Committee knew or should have known but
15  did not cause the disclosure of such facts.

16      62.   Throughout the first half of 2007, the Defendants caused the
17  Company to issue press releases and make SEC filings that mischaracterized
18  BOAC's finances as being secure and unthreatened by deteriorating market
19  conditions.

20      a.    On January 23, 2007, BOAC issued a press release touting its
21  performance in 2006, giving part of the credit to its acquisition of MBNA.
22  The same portrait was included in its Form 10-K filed with the SEC on
23  February 28, 2007.

24      b.    In announcing its results for the first quarter of 2007, both in a press
25  release and in its Form 10-Q, the Company again lauded its performance,
26  which it characterized as "a solid start in 2007 despite a challenging
27  operating environment" that suggested continued positive performance due
28  to "strong customer momentum across our lines of business."

21

c. Similarly, for the second quarter of 2007, the Company's profits increased, which, according to Defendant Lewis, was due to BOAC's "diverse business model," which allowed it "to continue attractive earnings growth despite challenging headwinds."

63. In these representations, and as 2007 proceeded into its third quarter, no public mention was made of BOAC's subprime and related loss exposure. By August 2007, as BOAC was in fact preparing to take significant writedowns based on the declining value of its subprime investments, the only reference to the subprime crisis by the Company was in its Form 10-Q, which acknowledged that "market uncertainty increased dramatically," including markets for CDOs, but concluded without giving a hint of the precarious posture of the Company: "While it is difficult to predict how long these conditions will exist and which markets, products or other businesses of the Corporation will ultimately be affected, these factors could adversely impact the Corporation's results of operations." In fact, the Board and senior management was well aware that these "factors" had already negatively impacted on BOAC's financial and operating condition, but such impact remained hidden.

64. At a Bank of America Securities Investors Conference on September 17, 2007, BOAC's Chief Financial Officer, Defendant Price, made three passing references to the subprime crisis, yet each time minimized the extent of the Company's exposure in that crisis.

65. Even in October 2007, when BOAC reported a third quarter decline in net income of 32 percent to $3.7 billion from $5.42 billion a year earlier, Defendant Lewis expressed his "disappointment" at such results, but again made no mention of the extent of the Company's exposure in what he called "the significant dislocations in the capital markets." Far from acknowledging the risk to which senior management and the Board had recklessly exposed the Company, he touted the very actions that created that exposure: "We continued to . . . introduce

22

1   innovative products and services to differentiate Bank of America in the
2   marketplace. While we cannot predict the near-term, I am confident that such
3   innovation and execution combined with the advantages of scale and reach are the
4   formula for future success."

5       66.   As the market deteriorated, however, the Defendants could not
6   continue this pose, and finally, in a Form 10-Q filed in November 2007,
7   management described in general terms BOAC's involvement with CDOs and its
8   $12.1 billion in liquidity puts.

9       67.   It was only on November 13, 2007, in a conference presentation by
10  Defendant Price, that the public was first informed that BOAC had significant
11  subprime-related exposure.

12      68.   A month later, on December 12, 2007, in another conference
13  presentation, Defendant Lewis admitted to investors that the Company would have
14  to writedown a larger amount of its subprime-backed CDO investments than
15  previously expected. While he was more candid than he had previously been, he
16  nevertheless concealed material facts which would have revealed that BOAC's
17  financial and operating condition was far worse than was indicated. The price of
18  the Company's stock plummeted, by January 18, 2008 losing 33 percent of its
19  value since February 20, 2007.

20      69.   On January 23, 2008, BOAC announced that for the fourth quarter of
21  2007 it was taking a $5.28 billion writedown due to its CDO investments. The
22  Company also disclosed rising credit risks in its portfolio and noted the reduced
23  quality of the investments it had made in 2007. Thereafter, the Company's senior
24  management "dribbled" corrective information into the marketplace but continued
25  to release false and misleading information to the Company's shareholders and to
26  the investing public.

27      70.   As recently as the Company's August 7, 2008 10-Q Report, it
28  begrudgingly acknowledged, *inter alia*, "We have incurred additional losses on

23

1   CDOs and related subprime exposure…and continue to reduce our exposure to
2   these vehicles." It went on to say that "…some of the SIVs that we have purchased
3   or are held…are expected to be restructured which may result in additional losses."
4   Most glaringly, for the 6 months ended June 30, 2008, management reported that
5   BOAC had net income of $4.6 billion when, in fact, earnings were materially
6   overstated as a result of, *inter alia*, the Company's failure to appropriately
7   writedown assets to their fair market values, its failure to make appropriate
8   provisions for loan losses and otherwise acknowledge the deterioration of its
9   financial and operating condition. Consistent with the individual Defendants'
10  deception, in order to artificially support market prices for the Company's common
11  stock, in July 2008, BOAC's Board authorized management to repurchase up to 75
12  million shares of such stock for up to $3.75 billion. To the extent that the Company
13  makes such purchases to support its stock, it will waste BOAC's badly-needed
14  capital.

15      71.   In connection with the individual Defendants' deception of the
16  investing public, they have subjected the Company to litigation by defrauded
17  investors who relied, directly or indirectly, on the false and misleading information
18  they disseminated regarding the actual deteriorated circumstances at BOAC as
19  described herein. As a consequence of such conduct, the Company may be subject
20  to substantial expense in an amount which cannot be readily determined at present.

21                          E. AUCTION RATE SECURITIES
22      72.   The Company, through one or more subsidiaries, has underwritten and
23  marketed so-called "Auction Rate Securities" ("ARS") to its brokerage customers
24  and others. In the context of such underwriting and marketing of ARS, the
25  Company concealed material facts from the purchasers of ARS including, in
26  particular, the fact that ARS were not the same as or otherwise functionally
27  equivalent to money market mutual funds.
28

1    73.    Upon information and belief, the Company has agreed in principle
2  with the SEC, the New York Attorney General's Office, and other state regulators
3  to settle their ongoing investigations of the Company's practices relating to ARS.
4  These investigations were commenced after the ARS market collapsed in mid-
5  February 2008, leaving thousands of the Company's customers holding massive
6  amounts of the illiquid securities — sold to them by the Company as "cash
7  equivalents"-- for an indefinite period of time.

8    74.    For example, on September 10, 2008, the Company announced that it
9  has agreed with Massachusetts regulators to settle their ongoing investigations of
10  the Company's practices relating to ARS by paying $4.5 billion to investors that it
11  defrauded. As a result, the Company be forced to absorb a pre-tax charge of $275
12  million with potential additional charges to follow as other settlements are reached.
13  Upon information and belief, the settlement agreed to with Massachusetts obligates
14  the Company to, *inter alia*, purchase all illiquid ARS from all of the Company's
15  retail customers, to fully reimburse all retail investors who sold their ARS at a
16  discount after the market failed, and to use its best efforts to liquidate all of the
17  ARS the Company sold by it. Additionally, to the extent that a customer has
18  incurred consequential damages beyond the loss of liquidity in the customer's
19  holdings of ARS (which should be restored pursuant to the settlement terms
20  above), the settlement requires the Company participate in a special arbitration
21  process that the customer may elect, and that will be overseen by Financial
22  Industry Regulatory Authority ("FINRA"), whereby the Company will not contest
23  liability for its misrepresentations and omissions concerning the ARS. Finally, the
24  Company will be undoubtedly be obligated to pay tens of millions of dollars in
25  fines and/or penalties as a result of the still ongoing investigations, all of which has
26  been caused by the intentional or reckless violations of law by BOAC's
27  management.

28    75.    Such investigations revealed that the Company, through its

25

1  management, has repeatedly and persistently committed fraud by making material
2  misrepresentations and omissions in connection with BOAC's underwriting,
3  distribution and sale of ARS.

**CAUSES OF ACTION**

**COUNT I**

**BREACH OF FIDUCIARY DUTY**

7      76.    Plaintiff incorporates by reference and realleges each and every
8  allegation set forth above as though fully set forth herein.

9      77.    Each of the Defendants owed BOAC and its shareholders the highest
10  fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs.
11  Each owed BOAC and its shareholders the fiduciary duty to exercise good faith
12  and diligence in the administration of the affairs of the Company and in the use and
13  preservation of its property and assets.

14      78.    By taking BOAC into massive investment and participation in highly
15  risky subprime financing, while failing to implement prudent risk-management
16  processes, then compounding that risk exposure by acquiring Countrywide, and by
17  taking the Company into other ventures that exposed it to related risks, Defendants
18  did not merely exercise business judgment. Rather, as set forth above, they were
19  reckless in their stewardship of BOAC and disregarded sound business practices
20  and knowingly, intentionally, recklessly, or negligently breached his or her
21  fiduciary and other duties owed to BOAC and its shareholders, and, thereby,
22  caused the Company to waste its assets, expend corporate funds unjustifiably, and
23  impair its reputation and credibility for no legitimate business purpose, as a result
24  of which BOAC has been and continues to be substantially damaged.

25      79.    In addition, as part of their duty to exercise good faith and diligence in
26  the administration of the affairs of the Company, Defendants had and have a duty
27  to promptly disseminate accurate and truthful information with regard to the
28  Company's revenue, margins, operations, performance, management, projections,

26

1  and forecasts, as well as other material facts bearing upon its operations and
2  financial condition. Defendants not only failed to disseminate truthful information
3  concerning the Company's varied and extensive participation in subprime
4  financing, and other ventures with related risks, but caused the Company to engage
5  in transactions designed to hide the Company's true financial and operating
6  condition and artificially inflate the price of the Company's stock.

7      80.    Further, once the members of the Board were on notice of the conduct
8  of Defendant Lewis and other members of senior management as set forth above,
9  they should have taken but failed to take appropriate remedial action including,
10 *inter alia*, commenced litigation and otherwise sought recovery of the Company's
11 damages as demanded on behalf of Plaintiff and otherwise.

12     81.    Accordingly, Plaintiff, on behalf of BOAC and its shareholders, seeks
13 from the individual Defendants monetary damages, injunctive remedies, and other
14 forms of equitable relief.

15                          **COUNT II**

16                          **NEGLIGENCE**

17     82.    Plaintiff incorporates by reference and realleges each and every
18 allegation set forth above as though fully set forth herein.

19     83.    Each Defendant was negligent in the performance of his or her
20 responsibilities for the management and governance of BOAC, as a result of which
21 the Company was and will continue to be substantially damaged in an amount
22 presently unknown.

23     84.    Accordingly, Plaintiff, on behalf of BOAC and its shareholders, seeks
24 from the Company's officers and directors named as Defendants herein monetary
25 damages.

26
27
28

## COUNT III

### INDEMNIFICATION

85. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

86. The individual Defendants, as fiduciaries and agents of BOAC, breached their fiduciary and other duties to BOAC and its shareholders, as set out above.

87. BOAC has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it. Part of that injury suffered by BOAC as a result of this wrongdoing by the Company's officers and directors may be liability to investors, to government regulators, and others.

88. Accordingly, plaintiff, on behalf of BOAC and its shareholders, seeks from the Company's officers and directors named as Defendants herein complete and full indemnification to the extent BOAC is found liable for the wrongdoing of these Defendants and those who acted wrongfully together with them.

## COUNT IV

### UNJUST ENRICHMENT

89. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

90. Each of the individual Defendants was unjustly enriched by the payments made and/or payable to them as compensation and otherwise by the Company.

91. Throughout the relevant period, each of the directors among the Defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of BOAC. Similarly, the senior officers of BOAC among the Defendants were being paid and will be paid substantial salaries and other compensation for their purported services to the Company. All of such

1  payments and fees were unearned and unjustified since these officers and directors
2  so utterly failed to fulfill their responsibilities for the management and governance
3  of the Company.

4      92.  Each of the individual Defendants not only received and retained the
5  funds unjustly received but invested such funds, thereby receiving additional unjust
6  enrichment.

7      93.  As a result of the foregoing unjust enrichment, each of the individual
8  Defendants should be required to account for and repay to BOAC the respective
9  amounts paid plus interest based upon each of these Defendants' investment and
10  retention of the proceeds of their unjust enrichment, and to disgorge all other
11  profits, benefits, and compensation obtained by them from their wrongful conduct.

12                        <u>**PRAYER FOR RELIEF**</u>

13      Wherefore, Plaintiff prays that the Court enter judgment against the
14  Defendants:

15      A.    declaring that each of the Defendants has breached his or her fiduciary
16  and other duties owed to BOAC and its shareholders as alleged herein;

17      B.    directing all the individual Defendants, jointly and severally, to
18  account for all losses and damages sustained by BOAC caused by reason of the
19  acts and omissions complained of herein;

20      C.    awarding BOAC money damages against all of the individual
21  Defendants, jointly and severally, for all losses and damages sustained and to be
22  sustained by BOAC and its shareholders as a result of the acts, omissions and
23  transactions complained of herein;

24      D.    directing the individual Defendants to account for and to remit and
25  disgorge to BOAC all profits and other benefits and unjust enrichment they have
26  obtained and retained as a result of the acts and omissions complained of herein,
27  including all salaries, bonuses, fees, stock awards, options, compensation and
28  common stock sales proceeds together with the earnings upon such amounts by

1  which such Defendants were unjustly enriched and imposing a constructive trust

2  thereon;

3        E.    ordering that the senior management of BOAC named as Defendants

4  herein and those under their supervision and control refrain from further

5  misconduct as alleged herein and to implement corrective measures that will

6  rectify all such wrongs as have been committed and prevent their recurrence;

7        F.    ordering the Company to take all necessary actions to reform and

8  improve its corporate governance and internal control procedures including, *inter*

9  *alia*, establishing and implementing effective risk management and accounting for

10  its operations and financial condition in compliance with GAAP;

11        G.    awarding BOAC pre-judgment and post-judgment interest as allowed

12  by law;

13        H.    awarding BOAC punitive damages;

14        I.    awarding Plaintiff's attorneys' fees, expert fees, consultant fees and

15  other costs and expenses; and

16        J.    granting such other and further relief as the Court may deem just and

17  proper.

18                               **JURY TRIAL DEMANDED**

19       Plaintiff demands a jury trial as to all issues so triable.

20

21  September 15, 2008

22                               CUNEO, GILBERT & LADUCA, LLP

23                               By:

24                               JON TOSTRUD (State Bar No. 199502)
                             1801 Century Park East, Suite 2400

25                               Los Angeles, CA 90067
                             Telephone: (310) 418-8262

26                               Facsímile: (310) 556-9622
                             E-mail: tostrud@yahoo.com

27

28                               CUNEO GILBERT & LADUCA LLP
                             JONATHAN W. CUNEO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBERT J. CYNKAR
MATTHEW MILLER
507 C Street, NE
Washington, DC 20002
Telephone: (202) 789-3960

*Attorneys for Plaintiffs*

# EXHIBIT A

# CUNEO
# GILBERT &
# LaDuca,
# LLP

May 23, 2008

<u>**SENT VIA FEDERAL EXPRESS**</u>

Board of Directors
c/o Corporate Secretary
Bank of America Corporation
100 North Tryon Street
Charlotte, NC 28255

Dear Directors:

     I am writing to you on behalf of P. E. Lucas, who, through a revocable trust, is the owner of shares of the common stock of Bank of America Corporation ("BOAC" or "the Company") currently and at all relevant times. A copy of the relevant page of my client's brokerage statement showing such ownership is enclosed with this letter with unrelated information redacted therefrom.

     This letter is being sent to you to demand that the Company commence legal proceedings to recover its damages from each of you, from BOAC's present and former senior management, who have also been responsible for the wrongdoing referred to herein, against the Company's purportedly independent registered accounting firm, PricewaterhouseCoopers LLP ("PWC"), and all those other persons or entities who have aided and abetted or otherwise participated in such wrongdoing.

     This letter is also being sent to you to demand on my client's behalf that BOAC undertake fundamental corporate governance and policy changes to prevent recurrence of the debacle described below, including failures of the Company's internal and external audits. Inherent in such policy changes is, *inter alia*, the reversal of BOAC's reckless expansion plans pursuant to which the Company has become too large to manage successfully, termination of its proposed acquisition of Countrywide Financial Corporation ("Countrywide") announced January 11, 2008 and suspension of its consideration of other potential acquisitions such as Washington Mutual, Inc. ("WaMu").

     This letter is being sent to you in the context of, *inter alia*, the revelations over the past several months of massive, multi-year reckless mismanagement of the Company, which has led to losses of billions of dollars to date, additional provision for massive losses, the continuing concealment of contingent future losses and the deterioration of BOAC's stockholders' equity of billions of dollars, primarily due to, according to management, the conduct described herein.

☐**Main Office**
507 C Street, NE
Washington, DC 20002
Tel (202) 789-3960
Fax (202) 789-1813

☐**New York**
Rockefeller Center, 620 Fifth Avenue
New York, NY 10020
Tel (212) 698-4504
Fax (212) 698-4505

☐**Los Angeles**
9254 Thrush Way
West Hollywood, CA 90069-1131
Tel (310) 276-9179
Fax (310) 276-9187

☐**Maryland**
13507 Rippling Brook Drive
Silver Spring, MD 20906
Tel (301) 460-1812
Fax (301) 460-1813

**www.cuneolaw.com**

Board of Directors
c/o Corporate Secretary
Bank of America Corporation
May 23, 2008
Page 2

Indeed, in the fourth quarter of 2007, BOAC wrote off approx. $5.28 billion in collateralized debt obligations ("CDOs"), leaving another $8 billion subject to further write-offs. The Company reported that its net income fell by approx. $5 billion from the same period a year earlier. In the first quarter of this year, you set aside $6 billion to purportedly cover current and future loan losses. For such quarter, the Company reported that it took losses equal to 1.71 percent of total home equity loans but expects that such percentage will rise substantially going forward. Had management fully and fairly accounted for its financial condition, including making adequate provision for loan and other losses, it would have reported a substantial loss. Indeed, Liam McGee, one of BOAC's senior officers, said on May 20, 2008 that the Company will likely have to earmark more for bad loans in coming periods.

The massive financial deterioration of BOAC's financial condition is a function, in part, of its sheer size, which you have recklessly permitted to grow without, *inter alia*, taking appropriate steps to protect and preserve its assets. Indeed, there can be no doubt as to responsibility for the Company's mania for growth at any cost, which must be clearly laid at your doorstep. You and senior management have created an ever-expanding behemoth and, in the process, have wasted the Company's assets by staggering amounts by failing to oversee and carry out effective risk management. Even your CEO, Ken Lewis, has finally acknowledged that he and his predecessors have made BOAC far too complex to manage effectively, that its performance "has not been what it should have been," that he is "retooling" the business and is now looking for "a simpler world."

Notwithstanding Mr. Lewis' belated acknowledgements and wish for "a simpler world," after "investing" $2 billion in Countrywide late last year without adequate due diligence, you appear to be proceeding with management's plan to acquire Countrywide outright. Not only is BOAC unable to verify Countrywide's actual financial condition, but it has highly material contingent liabilities which neither you nor the Company's advisors and auditors can competently evaluate. These contingent liabilities flow from Countrywide's illegal and/or otherwise unethical business practices which have resulted in numerous governmental criminal and civil investigations, litigation by borrowers and defrauded investors, among others. It is bad enough that Countrywide's condition is what it is, but when it is being considered as a prospective acquisition, you fail to consider that BOAC is already bloated and unable to cope with a "problem child" the size of Countrywide (or, for that matter, WaMu) and with the magnitude and complexity of the challenges it faces. Quite simply, BOAC should get its own house in order before taking on problems that can readily be avoided.

As The New York Times noted in an article on January 11 following the announcement of BOAC's acquisition of Countrywide, the Company's highly speculative "investment" in it has already damaged BOAC's reputation: "It went looking for a bargain and got burned." If BOAC proceeds to acquire the "basket case" that is now Countrywide, its reputation not only will be damaged permanently but the Company and its shareholders will undoubtedly suffer additional billions of dollars in potential but unknowable damages. As The Wall Street Journal of January 11 put it:

Board of Directors
c/o Corporate Secretary
Bank of America Corporation
May 23, 2008
Page 3

> "[The acquisition of Countrywide by BOAC] also would bring some ticking time bombs, whose power to destroy value won't be clear at least until the housing market bottoms out."

The proposed Countrywide transaction is all the more perilous for BOAC when it is considered that following the Company's acquisition of LaSalle Bank from a Dutch holding company for about $21 billion in cash, its reported capital levels have been materially reduced to about 6.9%, well below CEO Lewis' target of 8% and barely above the minimum regulatory requirement of 6%. Assuming the Company owns up to and publicly discloses its additional capital deterioration that remains concealed, BOAC's capital levels will be wholly inadequate to conduct operations safely and as they have been carried out in the past.

Although the Company acknowledged $5.4 billion of write-downs in the last quarter of 2007 and has indicated that it has only $12 billion of remaining exposure to sub-prime related write-downs of assets, it conceals the fact that only the "tip of the iceberg" has been disclosed, the bulk of which materially overvalued assets include improvidently extended credit card receivables, corporate loans receivable, additional real estate-related loans and "assets" where adequate provisions for losses have not been recognized. As you are aware or should be aware, such assets remain overvalued on BOAC's financial statements by many billions of dollars and, as well, there are material contingencies which are not yet reflected or honestly described in the Company's financial statements.

By way of one example, BOAC is believed to have sold, through its subsidiaries, CDOs, highly inappropriate, illiquid and unsuitable investment vehicles for most investors. Management also widely sold to customers structured investment vehicles ("SIVs"), another type of financial derivative "product", that has appeared to have subjected the Company to various investigations by state and other regulators. Additionally, your controlled fund, the Columbia Strategic Cash Portfolio, operated by the Company's subsidiary, Columbia Management, "invested" in massive amounts of high-risk SIVs which deteriorated in value by many billions of dollars and the fund has now been closed.  Through its subsidiaries, BOAC's packaging and sale of CDOs and SIVs have subjected the Company to massive liabilities to purchasers of such "products," none of which liabilities are reflected in its financial statements. While the Company announced in January that it was curbing activities in structured products such as CDOs, there remains additional billions of concealed exposure to direct loss and claims.

As noted above, it appears that the Company's financial statements, even with the reduction of shareholders' equity by billions of dollars, intentionally understated and continue to understate such reduction. This financial debacle and the deception in its wake by you and senior management was caused by a systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management, all of which has caused the Company to suffer billions of dollars in damages as described herein and untold billions going forward, leaving it perilously short of capital which may well cause it to go hat-in-hand to obtain additional and costly capital as it did most recently with its new issue of 8.20% preferred stock. The Company's failure to honestly and fairly disclose its true operational and

Board of Directors
c/o Corporate Secretary
Bank of America Corporation
May 23, 2008
Page 5

and those firms which directly or indirectly provided so called "appraisals" and/or credit ratings upon which the Company and/or the originators of the loans referred to above relied, directly or indirectly, to the Company's detriment. As you know, as a result of the misconduct of its officers and directors and other culpable persons, BOAC has already sustained substantial damages and continues to be subject to further damages in the billions of dollars as well as the massive legal and other expenses of defending against and resolving claims made against the Company by purchasers of its securities and those who purchased from it, *inter alia*, SIVs and CDOs.

Similarly, to the extent that any of the foregoing persons has been unjustly enriched at the expense of the Company, including those entities and persons who have received fees and/or other compensation that was excessive under the circumstances referred to above, I demand that BOAC commence litigation against them seeking injunctive relief which, *inter alia*, requires them to account to it and repay any such unjust enrichment together with the earnings thereon. Included within such unjust enrichment are the proceeds of the exercise of any stock options by senior officers during the relevant period while in possession of material inside information, as well as any salaries and bonuses received by such senior officers (including the compensation paid and to be paid to Mr. Lewis) and, in the case of PWC, fees paid to it during the relevant period for its purported audits of the Company's financial statements.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent (either as defined in BOAC's so-called "Director Independence Categorical Standards" or otherwise), disinterested or can properly and objectively deal with such demands, which you cannot. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your failure to date to cause BOAC to appropriately pursue all of its claims arising from the matters referred to herein. Should you not act to protect the Company's valuable claims as set forth herein, you will be engaging in further waste of its assets. The demands have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced.

I look forward to hearing from you or your counsel within thirty days.

Sincerely,

Jonathan W. Cuneo
Jonathan W. Cuneo

By BST

Enclosure

# VERIFICATION

I, P.E. Lucas, hereby declare and verify as follows:


I am the plaintiff in the above-captioned case. I have read the contents of the

foregoing Complaint. I am informed and believe that the facts related therein

are true, based upon facts as related to me by my counsel, and on that

ground, I verify that the facts stated therein are true.


September 12, 2008

P.E. Lucas

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Gary A. Feess and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV08- 6029 GAF (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X]** **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ]** **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ]** **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CUNEO GILBERT & LADUCA, LLP
JON TOSTRUD (State Bar No. 199502)
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 418-8262
Facsimile: (310) 556-9622
E-mail: tostrud@yahoo.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| P.E. LUCAS,<br>Derivatively on Behalf of Bank of America Corporation,<br>and its shareholders,<br><br>                             PLAINTIFF(S)<br>v. | CASE NUMBER<br><br>**CV08-06029  GAF  FMOx** |
| KENNETH D. LEWIS,  *see attached*<br><br>                         DEFENDANT(S). | **SUMMONS** |

TO:   DEFENDANT(S): _____ *to the abovenamed defendants*

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, __Jon Tostrud_____, whose address is _Cuneo Gilbert & LaDuca, LLP, 1801 Century Park East, Suite 2400, Los Angeles, CA 90067____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   SEP 1 5 2008  _____

By:    **NATALIE LONGORIA**  _____
                 Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1198

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[(1)] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                Date                       *Signature of Server*

                                    _____
                                      *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

| Print | Save As... | Export as FDF | Retrieve FDF File | Reset |

1
2   GIFFORD, MONICA C. LOZANO,                    )
3   WALTER E. MASSEY, THOMAS J. MAY,              )
4   PATRICIA E. MITCHELL, THOMAS M.               )
5   RYAN, O. TEMPLE SLOAN, JR.,                   )
6   MEREDITH R. SPANGLER, ROBERT L.               )
7   TILLMAN, and JACKIE M. WARD,                  )
8                                                 )
9                                                 )
                Defendants,                       )
10                                                )
11                                                )
                  and                             )
12                                                )
13                                                )
    BANK OF AMERICA CORPORATION,                  )
14                                                )
15                                                )
                Nominal Defendant.                )
16                                                )
17  _____      )

18                      **COMPLAINT**

19                 **NATURE OF THE CASE**

20      1.    Plaintiff P.E. Lucas, a shareholder of Bank of America Corporation,
21  ("BOAC" or "the Company"), brings this derivative action on behalf of the
22  Company and its shareholders against certain current and former officers and
23  directors of BOAC to remedy, *inter alia,* the massive mismanagement of the
24  Company, breaches of fiduciary duty, waste of the Company's assets, and the
25  dissemination of false and misleading information regarding the Company's true
26  financial and operating condition.

27      2.    Since approximately 2005, senior management, led by Defendant
28  Kenneth D. Lewis, operating under the purported oversight of the Company's

                                  2

1  CUNEO GILBERT & LADUCA, LLP
   JON TOSTRUD (State Bar No. 199502)
2  1801 Century Park East, Suite 2400
   Los Angeles, CA 90067
3  Telephone: (310) 418-8262
   Facsimile: (310) 556-9622
4  E-mail: tostrud@yahoo.com

5  CUNEO GILBERT & LADUCA LLP
   JONATHAN W. CUNEO
6  ROBERT J. CYNKAR
   MATTHEW MILLER
7  507 C Street, NE
   Washington, DC 20002
8
9  Attorneys for Plaintiffs

10              UNITED STATES DISTRICT COURT

11       FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13  _____

14  P.E. LUCAS,                          )
                                         )
15  Derivatively on Behalf of Bank of America )
                                         )
16  Corporation, and its shareholders,   )
                                         )
17                                       )
                                         )
18               Plaintiff,              )
                                         )
19                                       )
                                         )
20                                       )   Case No.
         v.                              )
21                                       )
                                         )
22  KENNETH D. LEWIS, GENE TAYLOR,       )
                                         )
23  JOE L. PRICE, AMY WOODS              )
                                         )
24  BRINKLEY, WILLIAM BARNET, III,       )
                                         )
25  FRANK P. BRAMBLE SR., JOHN T.        )
                                         )
26  COLLINS, GARY L. COUNTRYMAN,         )
                                         )
27  TOMMY R. FRANKS, CHARLES K.          )
28

CUNEO GILBERT & LADUCA, LLP
JON TOSTRUD (State Bar No. 199502)
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 418-8262
Facsimile: (310) 556-9622
E-mail: tostrud@yahoo.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| P.E. LUCAS,<br>Derivatively on Behalf of Bank of America Corporation,<br>and its shareholders,<br><br>PLAINTIFF(S)<br>v.<br><br>KENNETH D. LEWIS, *See attached*<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV08-06029  GAF FMOx<br><br><br>SUMMONS |

TO:   DEFENDANT(S): _____   *to the above named defendents*

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, __Jon Tostrud_____, whose address is _Cuneo Gilbert & LaDuca, LLP, 1801 Century Park East, Suite 2400, Los Angeles, CA 90067____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____SEP 15 2008_____      By: _Natalie Grengsia_
                                            Deputy Clerk

                                          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

  Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                  Date                                  *Signature of Server*

                                    _____
                                    *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

Print     Save As...     Export as FDF     Retrieve FDF File     Reset

1   CUNEO GILBERT & LADUCA, LLP
2   JON TOSTRUD (State Bar No. 199502)
    1801 Century Park East, Suite 2400
3   Los Angeles, CA 90067
    Telephone: (310) 418-8262
    Facsimile: (310) 556-9622
4   E-mail: tostrud@yahoo.com

5   CUNEO GILBERT & LADUCA LLP
    JONATHAN W. CUNEO
6   ROBERT J. CYNKAR
    MATTHEW MILLER
7   507 C Street, NE
    Washington, DC 20002
8

9   Attorneys for Plaintiffs

10                **UNITED STATES DISTRICT COURT**

11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12                      **WESTERN DIVISION**

13  _____

14  **P.E. LUCAS,**                              )

15  Derivatively on Behalf of Bank of America    )

16  Corporation, and its shareholders,           )

17                                               )

18                Plaintiff,                     )

19                                               )

20                                               )   **Case No.**

21                v.                             )

22                                               )

23  **KENNETH D. LEWIS, GENE TAYLOR,**           )

24  **JOE L. PRICE, AMY WOODS**                  )

25  **BRINKLEY, WILLIAM BARNET, III,**           )

26  **FRANK P. BRAMBLE SR., JOHN T.**            )

27  **COLLINS, GARY L. COUNTRYMAN,**             )

28  **TOMMY R. FRANKS, CHARLES K.**              )

GIFFORD, MONICA C. LOZANO, )

WALTER E. MASSEY, THOMAS J. MAY, )

PATRICIA E. MITCHELL, THOMAS M. )

RYAN, O. TEMPLE SLOAN, JR., )

MEREDITH R. SPANGLER, ROBERT L. )

TILLMAN, and JACKIE M. WARD, )

 )

 )

 )

Defendants, )

 )

and )

 )

BANK OF AMERICA CORPORATION, )

 )

Nominal Defendant. )

_____ )

## COMPLAINT

### NATURE OF THE CASE

1. Plaintiff P.E. Lucas, a shareholder of Bank of America Corporation, ("BOAC" or "the Company"), brings this derivative action on behalf of the Company and its shareholders against certain current and former officers and directors of BOAC to remedy, *inter alia,* the massive mismanagement of the Company, breaches of fiduciary duty, waste of the Company's assets, and the dissemination of false and misleading information regarding the Company's true financial and operating condition.

2. Since approximately 2005, senior management, led by Defendant Kenneth D. Lewis, operating under the purported oversight of the Company's

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
P.E. LUCAS, Derivatively on Behalf of Bank of America Corporation and its shareholders

**DEFENDANTS**
Lewis, et al.
&
Bank of American Corporation, Nominal Defendant

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Jon A. Tostrud,   Cuneo Gilbert & LaDuca, LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067   P: (310) 556-9621

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in this State | ☐4 | ☐4 |
| Citizen of Another State | ☒2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☒5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** Yes ☐ No ☒   ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Derivative action against senior management and Board of Directors brought under sections 28 U.S.C. 1332 and 1391.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER | CONTRACT | PERSONAL INJURY | PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☒ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV08-06029**

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ No  ☑ Yes
If yes, list case number(s):  Arkansas Teacher Retirement System, et al., v. Countrywide Financial Corporation (07-cv-6923-MRP (MANx))

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Florida |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Please see attachment A |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Nationwide |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):**  _~signature~_   Date  9-15-08

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

**Attachment**          **(Citizenship of Defendants)**

Kenneth D. Lewis          North Carolina
Gene Taylor               North Carolina
Joe L. Price              North Carolina
Amy Woods Brinkley        North Carolina
William Barnet, III       South Carolina
Frank P. Bramble, Sr.     Delaware
John T. Collins           Massachusetts
Gary L. Countryman        Massachusetts
Tommy R. Franks           Oklahoma
Charles K. Gifford        North Carolina
Monica C. Lozano          California
Walter E. Massey          Georgia
Thomas J. May             Massachusetts
Patricia E. Mitchell      New York
Thomas M. Ryan            Rhode Island
O. Temple Sloan, Jr.      North Carolina
Meredith R. Spangler      North Carolina
Robert L. Tillman         North Carolina
Jackie M. Ward            Georgia

Bank of America Corporation          Delaware